**TEXAS & PACIFIC RY. CO., Appellant,**

v.

**Gladys FLOYD, Appellee.**

No. 15361.

Court of Civil Appeals of Texas.

Dallas.

Jan. 10, 1958.

Rehearing Denied Feb. 7, 1958.

Robertson, Jackson, Payne, Lancaster & Walker and L. P. Bickel, and Donald L. Case, Dallas, for appellant.

Caldwell, Baker & Jordan and Ken R. Davey, Dallas, for appellee.

DIXON, Chief Justice.

Appellee Gladys Floyd was a passenger in an automobile which stalled on the tracks at a railroad crossing in the path of an oncoming train. She escaped from the automobile before the collision took place, but in doing so sustained personal injuries. She sued appellant Texas & Pacific Railway Company for damages because of her injuries and was awarded judgment for $1,900.

The automobile, a 1950 model Pontiac, was owned and was being driven by Rubin Branch. His wife, Flossie Branch, was riding on the front seat between Branch and appellee Gladys Floyd, who was riding on the front seat next to the right-hand door. The three had left home about 6:30 p. m. to do some grocery shopping.

Soon after they had started out the automobile engine began to sputter. Driving north on Westmoreland Street, the automobile, driven by Rubin Branch, approached the railroad crossing at about the same time appellant's eastbound train approached the crossing. The crossing was open to view from both the tracks and the roadway. The railroad tracks approaching the intersection from the west take a slow curve, but the train was visible for a long distance as it came toward the crossing. The train's whistle was blowing, its bell was sounding, and the electric signal lights at the intersection were flashing their warning.

The automobile engine again began to sputter, and the automobile slowed down. Nevertheless Branch made no effort to stop. He undertook to beat the train across the intersection, and might have succeeded if the automobile engine had not failed. As it turned out, the car sputtered to a stop and stalled on the railroad tracks.

Appellee Gladys Floyd, after the car stalled, tried to open the right-hand door, but the inside handle was defective, and the door would not open. Appellee then lowered the door window and crawled through the opening head first, landing on the roadbed. She then rolled off the tracks to safety just before the train crashed into the stalled automobile. She received no injuries from the collision between the train and the automobile. She did sustain in-

juries as a result of her landing between the rails and her rolling out of the path of the train.

Appellee's suit for damages was tried before a jury. Appellee filed a trial amendment alleging that appellant had violated Ordinance No. 803, Dallas City Code, Title XXXV, Chapter 119, Art. 119–6, which provides that it shall be unlawful for railroads to operate their trains inside the city limits at a speed in excess of 12 miles per hour.

Among the findings made by the jury were these: (1) Appellant's train as it approached the crossing was not being operated at a rate of speed greater than that at which a person of ordinary prudence would have operated it under the same or similar circumstances; (2) the train's engineer did not fail to keep a proper lookout; (3) the engineer was not negligent in failing sooner to apply his brakes; and (4) the failure of Rubin Branch to stop his automobile within 50 feet, but not less than 15 feet of the nearest rail of the railroad track (Art. 6701d, sec. 86, Vernon's Ann.Civ.St.) was the sole proximate cause of the collision. However the jury also found that (5) appellant's train as it approached the crossing was being operated at a rate of speed in excess of 12 miles per hour, which operation (6) was a proximate cause of appellee's injuries. The jury further found that appellee suffered damages because of personal injuries in the amount of $1,900.

The trial court overruled appellant's motion for judgment disregarding the jury's findings numbered above as (5) and (6), and in the alternative for judgment non obstante veredicto. The court then sustained appellee's motion for judgment disregarding the jury's finding numbered above as (4), and entered judgment for appellee for $1,900.

The first six of appellant's points on appeal are based on the contention that we should hold as a matter of law, under the facts and circumstances established by the undisputed testimony, that the speed of appellant's train in excess of 12 miles per hour was not a proximate cause of appellee's injuries. There was no evidence, says appellant, or at least insufficient evidence, to support the jury's finding that such speed was a proximate cause of appellee's injuries, hence the trial court should not have submitted the issue to the jury; should have upon motion disregarded the jury's answers and rendered judgment for appellant; and the court was in error in overruling appellant's motion for new trial.

### The Evidence.

The nature of appellant's contention calls for a careful study of the evidence. We therefore deem it appropriate to reproduce from the record certain material testimony.

Appellee Gladys Floyd testified as follows:

"Q. Gladys, I will ask you after you turned off of Scrandolan and onto Westmoreland and as you were going towards the main line tracks what happened, please? A. Well, before we turned off Scrandolan going into Westmoreland he run through a little puddle of water and the motor started sputtering after we got into the main highway, which we call Westmoreland, and it just kind of sputtered a little bit and slowed down and started off again.

"Q. When you say 'started off again' you mean it was running all right? A. Yes, he was running around maybe fifteen (15) or twenty (20) miles an hour, just going on. * * *

"Q. And then what happened, please? A. Well, just a little before we got to the track it started sputtering again and I thought he was slowing down for a stop, but he just run up to the track and the motor died and I—that just happened.

"Q. Approximately how far would you say you were from the main line

tracks when the motor started sputtering again? A. Well, I wouldn't know how many feet it was, but I know it wasn't very far from the main line track when it started back sputtering again. * * *

"A. Yes, when we ran out in the main road it started sputtering first and then, you know, it just went away and just started to pick up and he did something and it started running again and after we got across that switch track he was running pretty good and just a little before we got to the main line, well, it started sputtering again and just run on up there in the middle of the track and went dead.

"Q. Gladys, before the car started to sputter again had you seen the train approaching? A. Yes, sir.

"Q. What direction was it coming from? A. It was coming from our left.

"Q. Could you tell how far down the track it was? A. No, sir, I couldn't tell how far but I can say it was a pretty good ways off. * * *

"Q. All right. Did you have occasion to see the train again before the collision actually occurred? A. Yes, sir.

"Q. When was the next time you saw it? A. When the car died in the middle of the track.

"Q. Where was the train at that time? A. It was entering around in that curve, just—it may have been a little above that curve, but it was just coming around into that curve when I looked up and I seen it coming and I tried the door to get out. * * *

"Q. Okay. *What happened, please, Gladys, when the car stalled? A. I tried to open the door, but the handle on the door just turned over and I don't know—I just rolled down the window and jumped out—I just rolled the window down real fast and I didn't look backward no more and just come out headforward; I didn't try to climb out, I just fell out in the middle of the track, and when I fell out why I just started rolling and praying to God to not let me be rolling under the train but away from it, and so, just as I rolled clear of the track I could hear that train hit the car and I just closed my eyes and I could hear it bumping going up the track.*

"Q. Gladys, had you ever opened that particular door of that car from the inside before? A. No, sir.

"Q. And you stated, I believe, when you pulled the handle it did not operate—it did not work? A. No, sir.

"Q. Where were you when the train hit the car, Gladys? A. Laying down by the side of the track.* * *

"Q. And you were driving fifteen-twenty miles an hour when you drove up on the tracks, the tracks where the accident was? A. *Well, he sort of slowed down and I thought he was going to stop, but after he run up in the tracks the motor just died.*

"Q. It sputtered as it had been sputtering before? A. Yes, sir, it started sputtering and then it just went dead up on the track.

"Q. And then is when you realized you were on the track and the car would not go any further and you had to get out, is that right? A. Yes, sir.

"Q. Well, before that, before you had ever got up on the tracks, you had seen the light and had seen the flash light flashing? A. Yes, sir, I seen the signal too.

"Q. You saw it from a pretty good distance? A. Well, it wasn't too far when I looked up and seen the signal.

"Q. And then you heard the whistle? A. Yes.

"Q. Do you know whether or not the driver of the car—what was the driver's name? A. Rubin Branch.

"Q. Did Rubin hear all those things, see any of them? A. I am sure he seen them; yes, sir, he seen the train.

"Q. Before you got up on the track? A. Yes.

"Q. He went ahead and drove up there anyway? You thought he was going to stop—A. Well, he was trying to make it across and he could have went across if the car hadn't of died on him.

"Q. Did Rubin say anything when you were stopped up there? A. He was just saying 'Don't let me down now, don't let me down now'—

"Q. He was talking to the car? A. Yes, sir, he was talking to the car, he wasn't talking to us.

"Q. And you tried the door and then you went out the window? A. Yes, sir.

"Q. When you went out the window did you have any trouble getting out the window, do you recall? A. Well, through that excitement, no, sir, it didn't seem like I had no difficulty falling out there.

"Q. He—did Rubin—Rubin did not stop before he went up on that track, did he? A. No, sir, he didn't stop.

"Q. Do you have any idea, really, how far away that train was the first time you saw it? A. No, sir, I don't. I know it was a pretty good ways off, it was in sight to where you can see it because the track is coming around the curve and you can see it a pretty good ways, you know, up there, riding along in a car or walking along the highway there.

"Q. And of course you haven't any idea how fast it was coming? A. Well, it was coming pretty fast.

"Q. After you got up on that track you didn't have much time to get out of that car, did you? A. I had just enough time to try that door and roll that window down, and I did that in a hurry. * * *

"Q. Could you have been wrong when you marked that? You told me you didn't know one way or the other, you didn't know how far the train was—A. I don't know how fast it was running, to be exact, but from the looks of it, riding along, just to look at it it looked like it was just up above that curve when I first looked, you know, and seen the train coming. When he— when we drove up in the track, after he slowed down before we got to the track, and I thought he was coming to a stop, well, that is when the car went dead and I looked again well, I looked again and it looked like it was just entering in that curve where it would throw that light in your face, where a glaring light in your face, it will blind you, you know, and not thinking you just have to work fast and try to save your own life because it looked every minute like it was going to strike. I didn't think he was going to make it. * * *

"Q. When you did see the light or hear a whistle did you mention anything to Rubin Branch about stopping? A. No, sir.

"Q. You said you thought he was going to stop? A. At the speed he was going I thought he was going to stop.

"Q. Well, he was going at the same speed he was before, fifteen or twenty? A. Well, yes, he had picked up, but then he had kind of slowed down before he rolled up on the railroad track, the road has kind of a hump too and it was quite natural when you run down there—anybody that was riding in a car would think the other fellow was going to stop and him not saying any-

*thing and you not the driver—I thought he was going to stop. * * ***

"Q. All right. Now, you got out of the car and you rolled. Did any part of the train strike your body? A. No, sir, not as I know of.

"Q. When the train hit the car did any part of the car strike your body? A. No, sir, not as I know.

"Q. Did any of the debris from the car strike your body? A. I didn't understand you.

"Q. Did any of the flying parts when that train hit that car, it really moved it down the track—did it throw anything off the car that hit you? A. Not that I can recall." (Emphasis ours.)

### Opinion.

■ Ordinarily the issue of proximate cause presents a fact question, but under some circumstances when the evidence is undisputed, it presents a question of law. Jennison v. Darnielle, Tex.Civ.App., 146 S. W.2d 788; Texas & Pacific Ry. Co. v. Bigham, 90 Tex. 223, 38 S.W. 162.

In considering the question in this case it is important to bear in mind that appellee Gladys Floyd was not injured in the collision between the train and the automobile. When the train hit the automobile she had already escaped from the automobile. No part of the train or the automobile hit her, nor was she injured by any flying parts. Her injuries resulted from her jumping or crawling headfirst through the car door window onto the ground, then rolling out of the path of the train.

■ It is also important to bear in mind that, whatever the speed of the train may have been, appellee had time before the collision to escape from the automobile, in fact did escape in time to avoid any injury in the collision. Appellee had time to realize that a collision was imminent; she had time to try to open the car door and discover that the handle on the inside was defective, so that the door would not open; she then had time to roll the car window down, and she had time thereafter to crawl or jump out of the opening thus made; and after landing on the tracks, she still had time to roll out of the path of the train. Certainly if she had time to perform all these operations and escape the collision, she would have had plenty of time, if she could have opened the automobile door, to have stepped out of the automobile and stepped unharmed out of the path of the train. Branch was driving a car with a defective inside door handle; and we are led to the conclusion that the defect in the car door handle, which made it impossible for appellee to open the car door, was the proximate cause of her injuries.

We shall not prolong this opinion with a detailed discussion of the law of proximate cause. The subject has been treated exhaustively by the authorities. 30–B Tex. Jur. 208–236; 65 C.J.S. Negligence §§ 103–115, pp. 645–706; 38 Am.Jur. 694–742; 28 Tex.L.R. 471; Restatement of the Law, "Torts", Chapter 16. In the case now before us appellee did not know how fast the train was traveling. She was motivated to leave the automobile, not by the speed, but by the *proximity* of the train, coupled with her belief that the automobile could not be moved in time to avoid a collision. The speed of the train was a prior or remote cause not closely enough connected in a causal manner to be considered a proximate cause of appellee's injuries. The speed of the train did nothing more than furnish the condition which gave rise to the occasion when appellee was injured. The train's speed in excess of 12 miles per hour may be said to have had a causal connection with appellee's injuries only in the sense that if the train had not been in the vicinity of the crossing at the time the automobile stalled on the tracks, appellee probably would not have been injured. That is not sufficient. Here we have a remote causal connection, broken by an intervening cause, which remote cause falls

far short of proximate cause under our law. East Texas Motor Freight Lines v. Loftis, 148 Tex. 242, 223 S.W.2d 613; Davis v. Younger Bros., Tex.Civ.App., 260 S.W.2d 637; Panhandle & S. F. Ry. Co. v. Sledge, Tex.Civ.App., 31 S.W.2d 146; Sledge v. Panhandle & S. F. Ry. Co., Tex. Com.App., 45 S.W.2d 1112; Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.2d 60; 30–B Tex.Jur. 214–215; 228–231. Appellant's first six points on appeal are sustained.

Appellant's brief presents other points of error as follows: (7) There was no evidence, or no sufficient evidence, that a valid city ordinance limiting the speed of trains to 12 miles per hour was in effect at the time the accident occurred; (8) there was no evidence, or no sufficient evidence, that the place where the accident occurred was within the Dallas city limits; (9) an irreconcilable conflict existed in the jury verdict in that the jury found on the one hand that Branch's failure to stop his automobile not less than 15 feet from the tracks was the sole proximate cause of the collision; but found, on the other hand, that the speed of the train was a proximate cause of appellee's injuries; (10) it was error in the submission of the damage issue to allow the jury to assess damages for mental pain and suffering; and (11) for future diminished earning capacity.

Our holding in connection with appellant's first six points of error requires us to reverse the trial court's judgment for appellee and to render judgment for appellant, regardless of our action on the five points above named. Consequently we see no occasion to discuss at length appellant's other points, which could have no greater effect in any event than to cause us to reverse and remand the case. Suffice it to say that we have considered appellant's other points and have concluded that in no instance do they point out error. If we be mistaken in the foregoing conclusion, we are still of the opinion that we should overrule, and we do hereby overrule, appellant's

last five points for the reason that in the light of our holding as to appellant's first six points, its last five points become immaterial, and any error, if any, they may point out will not affect our disposition of the appeal.

The judgment of the trial court in favor of appellee is reversed and judgment is here rendered in favor of appellant that appellee take nothing.